# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**MEDI-WEIGHTLOSS**
**FRANCHISING USA, LLC,**
**and MEDI IP, LLC,**

      **Plaintiffs,**

**v.**                                    **Case No. 8:13-cv-990-T-23TBM**
                                        **(Consolidated)**

**LAS COLINAS MEDI WEIGHTLOSS**
**CLINICS, LLC, SOUTHLAKE MEDI**
**WEIGHTLOSS CLINICS, LLC,**
**MONTGOMERY MAX GREEN, and**
**AMITY SMITH MATTEI, M.D.,**

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on **Plaintiffs' Motion for Preliminary Injunctive Relief** (Doc. 42), Defendants' response in opposition (Doc. 53),[1] Plaintiffs' reply (Doc. 49), and Defendants' sur-reply (Doc. 54).  The parties have also filed affidavits and other documentary evidence in support of their respective positions.  A motion hearing was held on

---

[1]Plaintiffs (herein "Plaintiffs" or "Medi") are limited liability companies organized and existing under the laws of Florida.  The opposition is filed on behalf of Southlake Medi Weightloss Clinics, LLC ("Southlake LLC"), Montgomery Max Green ("Green") and Dr. Amity Smith Mattei ("Dr. Mattei").  The Las Colinas Medi Weightloss Clinic ("Las Colinas Clinic") is no longer in operation and Las Colinas Medi Weightloss Clinics LLC ("Las Colinas LLC") is not party to the response in opposition.  Southlake LLC and Las Colinas LLC were organized under the laws of Texas.  Mr. Green and Dr. Mattei are residents in Texas.

August 6, 2013.  For the reasons set forth below, it is RECOMMENDED that Plaintiffs'

Motion be GRANTED.

I.

Medi-Weightloss Franchising USA, LLC and Medi IP, LLC (collectively, "Medi" or

"Plainiffs") brings suit against Las Colinas LLC, Southlake LLC, Mr. Green and Dr. Mattei,

M.D. (collectively, "Defendants") in a fifteen-count Verified Consolidated Complaint

("Complaint").  The action was previously filed as two separate matters, but was consolidated

on July 15, 2013.  *See* (Doc. 41).[2]  Plaintiffs' Complaint seeks monetary damages and

preliminary and permanent injunctive relief against Defendants for alleged violations of

various agreements, which include provisions related to confidentiality, conditional phone

assignments, post-termination trademark restrictions, and competition, as well as violations

relating to their trademarks and service marks.  (Doc. 48).  By its Motion (Doc. 42), Medi

seeks an Order issuing a preliminary injunction that directs Defendants and their agents,

servants, employees, and those people in active concert or participation with them, to comply

with the following:

> (1) Prohibit from violating the Franchise Agreement Confidentiality Covenants, Franchise Agreement Post-Terminate Trademark Restrictions, Conditional Assignment, and Franchise Agreement Competitive Restriction;

> (2) Prohibit from operating their competitive business for a period of two years at or within twenty-five miles of the Franchisee Medi Clinic or any Medi-Weightloss Clinics Business;

---

[2]The original complaint against Las Colinas and Green included Jill Westkaemper, M.D.  Plaintiffs and Dr. Westkaemper thereafter stipulated to entry of permanent injunctive relief.  (Doc. 32).  That stipulation has not yet been acted upon.  In any event, Dr. Westkaemper is not a named defendant in the consolidated Complaint.

2

(3) Prohibit from employing, in any capacity, for the purpose of any competitive business any employee of the Southlake Clinic or any other Medi-Weightloss Clinics Business;

(4) Cease using, advertising, or otherwise promoting, and to return to Medi all Southlake Clinic Numbers and Listings;

(5) Prohibit from disclosing or publishing to any party, or copying or using for such party's own benefit or for the benefit of any other party, any of the Medi Confidential Information including without limitation, all Personal Information, and all e-mail addresses and other contact information of any current or former Medi Weightloss Clinic Business customer or patient that Defendants obtained during or as a result of their affiliation with Medi;

(6) Cease using and to return to Medi all Confidential Information, as detailed in request number five;

(7) Prohibit from contacting through any medium, soliciting, or treating any current or former Medi Weightloss Clinic Business patients and customers;

(8) Relinquish to Medi, the Court, or an independent third-party analyst, all computers used by Defendants to (a) access the Advantage System at any time, or (b) to operate the Competitive Business, pending forensic analysis of the Confidential Information stored thereon;

(9) Prohibit from using the Medi Marks, and any signs, slogans, symbols, logos, advertising materials, forms, products and other items bearing the Medi Marks;

(10) Prohibit from using Medi's trade secrets and confidential business information, including, but not limited to, the Medi-System and the know-how related to its use;

(11) Prohibit from operating or doing business under any name or in any manner that gives the general public the impression that the Franchise Agreement is still in force or that Defendants are in any way connected with Medi or that Defendants have the right to use the Medi-System or Medi Marks;

(12) Prohibit from using the Medi Marks or other designations or indicia which are likely to cause confusion, mistake or deception;

(13) Prohibit from competing unfairly with Medi or any Medi-Weightloss Clinics Business in any manner whatsoever; and

3

(14) Relinquish to Medi the physical location and premises of the Southlake Clinic.

(Doc. 42 at 23-25).  In addition, should the Court determine that a bond is required, Plaintiffs

believe that a bond of $10,000 should be adequate.

II.

Medi is the franchisor of Medi-Weightloss Clinics franchises.  The franchises sell

proprietary and approved weight loss, nutritional weight management and wellness products

and services.  As franchisor, Medi entered into franchise agreements with Mr. Green on behalf

of Southlake LLC on March 18, 2008 and on behalf of Las Colinas LLC on December 29,

2010.  The respective agreements granted Southlake LLC the right to establish the Southlake

Clinic at 601 Zena Rucker Road, Suite 105, Southlake, Texas and the Las Colinas Clinic at

1030 West John Carpenter Fairway, Irving, Texas.  The agreements allowed the Clinics to

utilize the Medi trademarks, products, practices, methods, information, and software.  *See*

(Doc. 48, Exs. A-D).  By entering into the franchise agreements, Green and the Clinics

explicitly agreed to be bound by confidentiality covenants,[3] termination trademark

restrictions,[4] and non-competition restrictions[5].   (Doc. 48, Exs. A, C).  Under the franchise

_____

[3]As to confidentiality, the Franchise Agreement states, in part:

9.3     **Confidentiality Obligations**. You agree that your relationship with us does not vest in you any interest in the Confidential Information [as described in Section 9.1 of the Franchise Agreement] other than the right to use it in the development and operation of your Business, and that the use or duplication of the Confidential Information in any other business would constitute an unfair method of competition. You acknowledge and agree that the Confidential Information is proprietary, includes trade secrets belonging to us and is disclosed to you or authorized for your use solely on the condition that you agree, and you therefore do agree, that you:

(a)     will not use the Confidential Information in any other business or capacity;

(b)     will maintain the absolute confidentiality of the Confidential Information during and after the term of this Agreement; . . . .

***

17.5    **Confidential Information**. You agree that, upon termination or expiration of this Agreement, you will immediately cease to use any of our Confidential Information in any business or otherwise and return to us all copies of the Manuals and any other confidential materials that we have loaned to you.

[4]Section 17.4 of the Franchise Agreement states, in relevant part:

17.4    **Marks**. Upon the termination or expiration of this Agreement: (a) you may not directly or indirectly at any time or in any manner (except with respect to other MEDI-WEIGHTLOSS CLINICS ® Business you own and operate) identify yourself or any business as a current or former MEDI-WEIGHTLOSS CLINICS ® Business, or as one of our licensees or franchisees, use any Mark, any colorable imitation of a Mark or other indicia of a MEDIWEIGHTLOSS CLINICS ® Businesses (sic) in any manner or for any purpose or utilize for any purpose any trade name, trade or service mark or other commercial symbol that indicates or suggests a connection or association with us; . . . .

[5]Section 17.6 of the Franchise Agreement states, in relevant part:

agreements, the Clinics were each required to hire a licensed physician to serve as the Medical Director.  In March 2012, Dr. Mattei entered into a Confidentiality/Non-Competition Agreement for Professional Staff ("Medical Director Agreement") with Green and became the Medical Director for both Clinics.  (Doc. 48, Ex. E).  Dr. Mattei agreed to be bound by essentially the same confidentiality covenants and non-competition restrictions.  *Id.* Moreover, this agreement provided that Medi was "an intended third party beneficiary" under the agreement, giving it the right to take any and all legal action and to file suit to enforce Medi's rights under the agreement.  *See id.* at ¶ 14.

Eventually, both Clinics failed to make timely payments to Medi.  For Las Colinas, suffice it to say that attempts by Green at restructuring its debt with Plaintiffs failed.  On April 15, 2013, Medi terminated the Franchise Agreement with Las Colinas LLC, advising that the

---

17.6   **Competitive Restrictions**. Upon termination or expiration of this Agreement for any reason whatsoever (and you have not acquired a successor franchise), you and your owners agree that for a period of two (2) years commencing on the effective date of termination or expiration neither you nor any of your owners will have any direct or indirect interest (e.g. through a spouse or child) as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, member, Manager, representative or agent or in any capacity in any Competitive Business operating:

(a)     at the Site or through the Practice;

(b)     within twenty-five (25) miles of the Site; or

(c)     within twenty-five (25) miles of any other MEDI-WEIGHTLOSS CLINICS ® Business or Market Area in operation or under construction on the later of the effective date of the termination or expiration . . . .

6

clinic was "bound by all post-termination and non-competition covenants in the Franchise Agreement.  (Doc. 48, Ex. L).  Thus, the Las Colinas clinic is no longer in operation.

As for Southlake LLC, the clinic was sent a Notice of Default on August 15, 2012, stating that it had defaulted on its obligations for failure to pay certain sums due and owed under its Franchise Agreement.  (Doc. 48, Ex. N).  On August 29, 2012, Green, on behalf of Southlake LLC, entered into a Mutual Settlement Agreement with Medi, which consolidated past due fees into a promissory note and required Green to also sign an absolute guaranty. (Doc. 48, Exs. O-Q).  However, thereafter, Southlake LLC failed to make a number of payments, and on April 16, 2013, Medi issued another Notice of Default.  (Doc. 48, Ex. T). The Notice stated that on or before April 26, 2013, Southlake had the opportunity to remit the amount past due.  *Id.*  On April 26, 2013, Medi sent Southlake an Extension Notice, granting Southlake five additional days to cure its defaults.  (Doc. 48, Ex. U).  However, Southlake failed to respond, and on May 1, 2013, Medi terminated the Franchise Agreement, reminding Southlake that it was "bound by all post-termination and non-competition covenants in the Franchise Agreement."  (Doc. 48, Ex. V).  Medi also disconnected all access by Southlake LLC and its owners/employees to the Advantage Software.

Medi contends that well before receiving the Extension Notice on April 26, 2013, Defendants Green and Mattei formulated a plan to develop a competitive business, including to operate from the Southlake clinic location, using the same employees from the Southlake and Las Colinas Clinics; using the same telephone number as the Southlake clinic; providing either identical and/or strikingly similar products and services to those at Medi Weightloss

Clinics Businesses in violation of the Franchise Agreements and Mattei's Medical Director

Agreement; and misappropriating Medi Confidential Information and Personal Information.

Medi asserts that on Friday, April 26, 2013 at 4:10 p.m., prior to the termination of Southlake

as a Medi-Weightloss clinic, Dr. Mattei used the confidential contact information of current

and former Medi-Weightloss customers and patients to send an email announcing the opening

of her business, Revolution Wellness and Prevention Clinic ("Revolution") on Monday, April

29, 2013 at the same location as the Southlake clinic.  (Doc. 48, Ex. X).  A phone call on

April 26, 2013, made by a Medi employee posing as a potential client, indicated that the

Revolution clinic would be open on Monday.[6]  (Doc. 48, Ex. Y).  Likewise, a photograph of

the clinic taken on April 26, 2013, showed that the Medi sign was covered by a sign

advertising the Revolution clinic.  (Doc. 48, Ex. Z-1).  Between April 29, 2013 (pre-

termination) and May 1, 2013 (post-termination), Southlake continued to promote itself as a

Medi clinic on its Facebook page and on both Green's and Dr. Mattei's LinkedIn profiles.

Moreover, Dr. Mattei, with Green's assistance and/or acquiescence, continued to offer similar

services at the exact same location as the Southlake clinic, using the same phone number,

employees and equipment.  Visits by two "mystery shoppers" on May 1 and 3, 2013, revealed

that the business was offering a medically supervised weight loss program that was identical

to the one offered by Medi, and that Revolution was advertising itself as the same program

---

[6]The affidavit of Hilary Armstrong, recounting her phone conversation with an employee at Southlake, was filed in support of the statement.  (Doc. 48, Ex. Y).

with the same doctor, just with a different name and with additional medical services.  (Doc. 48, Exs. CC-DD).[7]

As a result of these actions, Medi filed its fifteen-count Verified Consolidated Complaint (Doc. 48), alleging that Southlake LLC breached its Franchise Agreement, Settlement Agreement and Promissory Note (Count I); Southlake LLC and Green breached the Franchise Agreement by assisting and conspiring with Mattei in the development and operation of Revolution (Count II); Dr. Mattei breached the Southlake Franchise Agreement (Count III); Green breached the Southlake Absolute Guaranty by failing to remit to Medi the total amount due (Count IV); Green and Mattei engaged in civil conspiracy to use the Southlake Clinic and its funds in operating Revolution, a competitive business (Count V); Mattei has committed acts of tortious interference damaging Medi, the Medi-System, its reputation and goodwill (Counts VI and VII); Mattei breached the Medical Director Agreement (Count VIII) and therefore, Green, Southlake LLC and Las Colinas LLC are liable in damages (Count IX); all Defendants misappropriated trade secrets (Count X); all Defendants violated the Lanham Act, 15 U.S.C. § 1125(a) by false designation of origin (Count XI); all Defendants engaged in common law unfair competition (Count XII); Las Colinas breached its Franchise Agreement, the FAP Addendum and its Promissory Note (Count XIII); Green breached the Las Colinas Owners' Guaranty (Count XIV); and Green breached the Las Colinas Absolute Guaranty (Count XV).  Accordingly, as detailed above, Medi seeks to enjoin Defendants from committing any further violations.  In particular, while

---

[7]The affidavits of Eric Padilla and Katie Altine were filed in support of these statements.  *See* (Doc. 48, Exs. CC-DD).

9

Green was the one that signed the Franchise Agreements, the injunction must also extend to Dr. Mattei because she was a beneficiary of the Franchise Agreement, and as the Medical Director, participated in and was generally in active concert with Defendants in running Southlake LLC.  *See* (Doc. 42).

In response (Doc. 53), Defendants deny any wrongdoing, claiming that they are not engaged in a competing weight loss business, are not using Plaintiffs' marks, and are not using any of Plaintiffs' confidential or proprietary information.  They argue that Plaintiffs are not entitled to injunctive relief as they have failed to clearly establish the four prerequisities necessary to obtain a preliminary injunction.  In particular, in considering Defendants' defenses, the Court should deny Plaintiffs' Motion.  Moreover, Defendants argue that Dr. Mattei is bound only by the restrictive covenants in the Medical Director Agreement and is not a signatory of the franchise agreement.  Pursuant to her Agreement, she is operating only within the carve-out, which does not prohibit Dr. Mattei from practicing medicine in medical areas other than weight loss, or prohibit her from treating patients from weight loss, provided that the medical practice does not actively advertise and market weight loss services to the public and does not generate more than 10% of its gross revenue from such services.  *See* (Doc. 48, Ex. E).  Defendants also object to some of the content within the Complaint and affidavits that Plaintiffs filed in support of their Motion, arguing that the Federal Rules of Evidence preclude such evidence.  Thus, the documents or portions thereof are not admissible

and cannot be considered in support of Plaintiffs' Motion.[8]  As for the bond, Defendants

request for a bond of at least $2.5 million.

In support of their response, Defendants filed the affidavits of Green and Mattei.

(Docs. 53-1, 53-2).  In particular, in her affidavit (Doc. 53-1), Dr. Mattei asserts that she is the

sole physician owner and operator of Revolution clinic and that neither Green or Southlake

has any financial interest, employment, ownership or leadership position with Revolution.

She states that under Texas law, as a doctor, she is obligated to ensure that her patients

received reasonable notice of the closing and are given the opportunity to obtain copies of

their records or arrange for the transfer of their medical records to another physician.  Shutting

down a practice without informing patients constitutes "patient abandonment," and would

violate her legal and ethical obligations.  This occurred to the patients at Las Colinas because

Medi shut off all access to the Electronic Medical Records.  In order to avoid this happening

at Southlake, she sent out the Friday, April 26, 2013, email to her patients in accordance with

her obligations under Texas law.  She also issued a press release to announce the opening of

Revolution.  Dr. Mattei contends that weight loss services are not the primary focus of her

practice at Revolution, and that she is not using any of Medi's proprietary information.  She

has taken a new lease from the landlord, which is in the name of Revolution; Green is not on

the lease.  She also asserts that she has trained her staff to advise callers and visitors that

---

[8]In particular, Defendants argue that paragraph 41 of the Verified Complaint, now paragraph 49 in the Verified Consolidated Complaint, is based upon information and belief, and therefore cannot be considered in support of the Motion.  The Court notes that while the Verified Complaint stated "[u]pon information and belief," the Verified Consolidated Complaint (Doc. 48) omitted this statement.  As such, the Court considers this argument moot.

Revolution is not associated with Medi in order to avoid the risk of confusion.  She states that she has ceased to use the previous telephone number that was assigned to Southlake.  She does not offer weight loss services unless it is a necessary part of a comprehensive healthcare and wellness regimen, and she does not actively advertise or market weight loss to the public.  Any observations made by Hilary Armstrong, Eric Padilla and Kate Altine do not reflect the conditions of the Revolution clinic today.  She states that granting an injunction would mean that her current patients would be abandoned in various stages of treatment.

As for Green, in his affidavit, (Doc. 53-2), he asserts that since April 26, 2013, he has not engaged in any business that competes with Medi.  The only weight loss clinic in which he is involved in is another Medi franchise, Park Cities Medi Clinic LLC, in North Dallas.  When he was notified that the Southlake franchise would be terminated, he negotiated with the landlord to surrender the space, and the landlord let him off the personal guaranty of the space.

In reply (Doc. 49), Plaintiffs argues that the Court may consider all affidavits and other evidence submitted in support of the Motion; none of Defendants' defenses preclude entry of a preliminary injunction; the availability of liquidated damages does not preclude entry of injunctive relief; Defendants' exorbitant bond demand should be disregarded; and Defendant Green was actively involved in the transition of a Medi-Weightloss Clinic Business into a competitive business and thus, may be subject to the injunction.  In support of its reply, Plaintiffs filed the affidavit of Dylan Deutsche, a former employee at the Las Colinas and Southlake clinics (Doc. 49-3).  Deutsche details April 16, 2013, the day that Las Colinas

12

received the cease and desist letter from Medi and the EMR (records management system) stopped working. The next day, on April 17, 2013, Green directed Deutsche to see patients at Las Colinas, but to run them and their credit card payments through the Southlake clinic. After Las Colinas was shut down, the employees and the supplies were moved to the Southlake clinic. During the week of April 22, 2013, Green and Dr. Mattei announced that "we" would be pulling away from Medi and changing to provide treatment for the whole body. They also told staff members that the lease would be in Mattei's name. Deutsch states that she was never trained on the additional services that Revolution was supposed to provide. She believes that about 99% of Revolution's patients were/are being treated for weight loss. Green continues to maintain an office at Revolution and is physically present almost every day. One of Green's companies, Medi Metroplex Enterprises, LLC, has provided all the payroll funds and benefits for Revolution staff.

By their sur-reply (Doc. 54), Defendants again assert that affidavits made on information and belief are generally considered insufficient to support a motion for preliminary injunction, citing Federal Rule of Evidence 901. Moreover, Plaintiffs have failed to provide any facts that demonstrate that there was an alleged conspiracy between Green and Dr. Mattei. Contrary to Plaintiffs' contentions, Dr. Mattei is not providing products and services that are identical and/or strikingly similar to those provided by Medi; neither Green or Dr. Mattei is violating an enforceable agreement with Plaintiffs; and Defendants have not used Medi's marks and protected information, nor caused any customer confusion in that regards. Moreover, Mattei's Medical Director Agreement, governed by Texas law, is void

13

and unenforceable.  Even if enforceable, Dr. Mattei is currently operating her practice within the carve-out expressly authorized by the agreement.

In support of their sur-reply, Defendants filed additional affidavits of Green and Mattei.  In Green's affidavit (Doc. 54-1), Green rebuts several statements made in Deutsch's affidavit.  In particular, he states that he made no announcement with Mattei that "we" would be changing the business.  Instead, Mattei herself discussed the changes.  Green admits to going to Revolution, but that he goes to discuss legal and other personal issues.  He also admits that his company, Medi Metroplex Enterprises LLC, had to provide the payroll to staff because Revolution was not set up to do so.  However, the funds for the payroll came from Revolution or Mattei and not from Green or any of his companies.  Medi Metroplex solely acted as the agent for the transaction.

In Mattei's affidavit (Doc. 54-2), she responds that she had patients go to Southlake clinic in order to uphold her obligation of continuity of care to her patients.  On April 16, 2013, Southlake LLC was given a Notice of Default that it would be terminated as a franchisee on April 26, 2013.  Mattei relied on this Notice in taking the actions that she did. She asserts that Revolution does not offer identical weight loss services; never utilized Medi handouts; and she did not instruct the staff to tell patients that Revolution's program was "the same thing."  Moreover, she provided training to staff on what to do differently during the transition from a weight loss clinic to a wellness medical practice.  While Revolution's payroll was initially through Green's company because she did not have the opportunity to establish her own system, beginning as of the May 27, 2013 payroll, Revolution began to use CGC

Southwest Management Services, LLC to manage the payroll.  While using Medi Metroplex, neither Medi Metroplex nor Green provided the money for Revolution's payroll.  Mattei also lists several examples showcasing that the clinic is fully a Revolution clinic.

On August 6, 2013, the Court conducted a hearing on the Motion for Preliminary Injunctive Relief.  Both parties presented oral argument on the Motion.  The matter is now fully briefed and ripe for review.

III.

Rule 65 of the Federal Rules of Civil Procedure governs the entry of a preliminary injunction.  The purpose of a preliminary injunction is to maintain the status quo until the court can enter a final decision on the merits of the case.  *United States v. DBB, Inc.*, 180 F.3d 1277 (11th Cir. 1999); *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).  A party seeking entry of a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205 (11th Cir. 2003); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Haitian Refugee Ctr., Inc. v. Baker*, 949 F.2d 1109, 1110 (11th Cir. 1991).

"[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four

prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)). The entry of a preliminary injunction is "the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." *Id.* at 1179 (citations omitted).  A plaintiff may support its motion for a preliminary injunction by setting forth allegations of specific facts in affidavits.  M.D. Fla. R. 4.06(b)(2), 4.06(b)(3).  In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction.  *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

IV.

Medi seeks a preliminary injunction against Defendants in order to: (1) enforce competitive restrictions; (2) prohibit use of Medi's confidential and proprietary information; (3) prohibit use of the Medi-marks; and (4) prohibit use, advertising or otherwise promoting the number and listings of Southlake clinic.  *See* (Doc. 42).

A.

Based on the record before the Court, Medi has shown a substantial likelihood of success on the merits as against Southlake LLC and Green on allegations that they breached competitive and confidentiality restrictions in their agreements with Medi.  While somewhat more problematic, I conclude the same as to Dr. Mattei.  Evidence reveals that she conspired and acted in concert with Green to create a new entity, providing services substantially similar to and in competition with Medi's business.

16

1.

On this Motion, Medi primarily seeks to enforce the competitive restrictions in the franchise agreement as to all Defendants.  Florida law recognizes that courts may enforce "contracts that restrict or prohibit competition during or after the term of restrictive covenants, so long as such contracts are reasonable in time, area, and line of business. . . ."  FLA. STAT. § 542.335(1).[9]  At present, Defendants do not argue that the limitations imposed by the agreements are unreasonable as to time, area and line of business.  Accordingly, I find that, in general, the competitive restriction is enforceable.

To establish the breach of contract claims under Florida law, Plaintiff must prove: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach."  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (applying Florida law).  Plaintiffs urge each element is demonstrated by the proffered evidence.  *See* (Doc. 42).  Defendants argue that Green has not engaged in a competitive weight loss business at Revolution; that Green nor Southlake LLC has any operating or financial interest in Revolution; and Green has no interest in the leased space where Revolution operates.[10]  Thus, Medi is unable to show a substantial likelihood of success on

_____

[9] Section 20.7 for the Franchise Agreement dictates that Florida law shall govern. (Doc. 48, Ex. A).

[10]Defendants also raise the defenses of unclean hands and selective enforcement to show that Plaintiffs do not have a likelihood of success on the merits.  The unclean hands defense is applicable "only where some unconscionable act of one coming for relief has *immediate and necessary relation* to the equity that he seeks in respect of the matter in litigation."  *Keystone Driller Co. v. Gen. Excavator Co.,* 290 U.S. 240, 245 (1933) (emphasis added).  Defendants must demonstrate that Medi's wrongdoing is directly related to the claim against which it is asserted, and that Defendants were personally injured by Plaintiff's

17

breach of the competitive restrictions.  And, as to Dr. Mattei, since she was not a signatory of the Franchise Agreement, she is not bound by the terms of the agreement.  *See* (Doc. 53).

The proffered evidence reveals a written franchise agreement with Southlake LLC, signed by Green, Green's personal guaranty, and a written settlement agreement signed by Green.  (Doc. 42, Exs. A, O, Q); *see also* FLA. STAT. § 542.335(1)(a) ("A court shall not enforce a restrictive covenant unless it is set forth in a writing signed by the person against whom enforcement is sought.").  As set forth above, the agreements contained non-compete and confidentiality provisions governing pre and post-termination conduct.

Second, Medi demonstrates that Green was actively involved in the conversion of the Southlake clinic to Revolution, a substantially competitive business to be operated by his

---

conduct.  *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 451 (11th Cir. 1993); *see also Worden & Co. v. Cal. Fig. Syrup Co.,* 187 U.S. 516, 528 (1903).  Defendants assert that Plaintiffs made unlawful and false representations regarding the profitability of a Medi franchise; the money to be made; the uniformity of the system; the services to be provided; the franchisers' cost of the products; that products would be sold only through franchisees; by shutting down Las Colinas and cutting off Dr. Mattei's access to her patients and patient records; and as to the post-termination conduct to be permitted.  (Doc. 57 at 20).  However, on this Motion, Defendants have failed to offer sufficient documentation to support this defense.  Accordingly, the defense of unclean hands will not serve as a bar to Plaintiffs' Motion.

As for the defense of selective enforcement, Defendants argue that Plaintiffs have waived their right to enforce the franchise agreement because they are engaging in selective enforcement.  As an example, Defendants point to Dr. Lopez, Southlake's past Medical Director, who started a competing weight loss clinic about half a mile away from Southlake.  While Plaintiffs argue that they failed to obtain an agreement that gave them third-party beneficiary rights to enforce her non-compete restrictions in her Medical Director Agreement, Defendants provide a February 22, 2013, cease and desist letter from Medi to Dr. Lopez that pointed to Section 14 of the Medical Director Agreement, the third-party beneficiary rights.  (Doc. 54-1 at 52).  Regardless, at present, I find Defendants have failed to offer sufficient documentation to support this defense.

18

former medical director, thereby breaching both the franchise and settlement agreements. (Doc. 42., Exs. A, O).  During the week of April 22, 2013, Green and Mattei announced that they were pulling away from Medi-Weightloss Clinics and would instead be providing health treatment for the "whole body" and preventative care.  *See* (Docs. 49-3 at 2, 54-1 at 2).  The new venture would operate at the same location where Green and Southlake clinic held their lease.  Green himself acknowledges that he took steps thereafter to transfer that lease over to Mattei.[11]  (Doc. 53-2 at 2).  There is no dispute that the staff members at Revolution were the same employees employed to operate their Medi clinics or that they were servicing the same customers.  Moreover, Green continued to maintain an office at the clinic.  (Docs. 49-3 at 4-5; 54-1 at 3).  And, at least up until the pay period beginning May 27, 2013, it is undisputed that Revolution's payroll was handled by Green's company, Medi Metroplex Enterprises, LLC. *E.g.,* (Docs. 54-1 at 3, 54-2 at 7).  Green also permitted Revolution to use the same telephone number that had been used by the Southlake clinic, which pursuant to Section 17.4(e) of the

---

[11]Section 4.3(b) of the Franchise Agreement provides, in pertinent part, that should the franchisee choose to lease from someone other than Medi, prior to entering the lease, the franchisee and the lessor "must sign [Medi's] then-current form of Conditional Assignment of Lease Agreement."  (Doc. 48, Ex. A at 16).  Then, in the event of a default of the lease or of the Franchise Agreement, section 4.3(d)(viii) provides that, "the Lease will, at [Medi's] option, be assigned to [Medi], [who] will become the Lessee, [who] will be liable for all obligations under the Lease once [Medi] take[s] possession, and the Landlord will recognize [Medi] as the Lessee as of the date of the Assignment Notice."  *Id.* at 17.  In addition, section 4.3(d)(xi) states, "the Lease cannot be modified or canceled without [Medi's] prior written approval.  *Id.*

19

Franchise Agreement,[12] Green was required to return to Medi.  This conversion could not have occurred without Green's active and ongoing participation.

Moreover, there is no question that Medi has legitimate business interests and the right to protect its ability to sell its franchises; its right to ensure continued compliance with its agreements by other franchisees; its maintenance of the strength of the Medi-System and the value of its confidential information; its association of the locations where Revolution is operating to Medi clinics; and the goodwill associated with its marks in the geographic region. Accordingly, Medi has established a substantial likelihood of success on its claims of breach of its competitive restrictions as to Green and Southlake LLC.

As for Dr. Mattei, while she was not a party to the Franchise Agreement or the settlement agreement with Medi, Plaintiffs argue that an injunction must also extend to her because she directly benefitted from the Franchise Agreement, signed the Medical Director Agreement with similar restrictions and to which Medi was a third-party beneficiary, and she and Green conspired to breach the governing contracts.

---

[12]Section 17.4(e) of the Franchise Agreement provides, in pertinent part, that upon termination or expiration of the Agreement,

> [the franchisee] will notify the telephone company and all telephone directory publishers of the termination or expiration of [its] right to use any telephone, telecopy or other numbers and any regular, classified or other telephone directory listings associated with any Mark, authorize the transfer of such numbers and directory listings to [Medi] or at [Medi's] direction and/or instruct the telephone company to forward all calls made to [the franchisee's] telephone numbers to numbers [Medi] specifi[ies] . . . .

(Doc. 48, Ex. A).

Here, Dr. Mattei was not a party to the Franchise Agreement and Settlement Agreement, and thus, she is not bound by the restrictive covenants therein.[13]  *See* FLA. STAT. § 542.335(1)(a) ("[a] court shall not enforce a restrictive covenant unless it is set forth in writing signed by the person against whom enforcement is sought.").  On the other hand, she is bound by similar restrictive covenants set forth in her Medical Director Agreement to which Medi is an express third-party beneficiary.  Assuming the enforceability of that Agreement, she is in violation and subject to being enjoined.[14]  However, even if unenforceable under

---

[13]Plaintiffs' third party beneficiary argument appears largely unsupportable.  Case law cited by Plaintiffs is distinguishable and I have not found binding authority that would direct the Court to extend the injunction to Mattei because she was a beneficiary of the franchise agreement.  *See Everett v. Paul Davis Restoration, Inc.*, 2012 WL 4128016, at *5-6 (E.D. Wis. Sept. 18, 2012) (finding that the direct benefit estoppel doctrine applied to enforcing an arbitration clause to the wife of a franchise owner because she received direct benefit from the franchise agreement, in particular that the remaining ownership interest was transferred to her); *Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834 F. Supp. 683, 692 (D.N.J. 1993) (holding that a restrictive covenant in a franchise agreement was enforceable against the individuals that signed the amendment to the agreement); *Pirteck USA, LLC v. Layer*, Business Franchise Guide ¶ 13.527 (M.D. Fla. Sept 23, 2005) (holding that a restrictive covenant is enforceable against assignees, even if they did not sign a contract).

Florida Statute § 542.335(f)(1) provides that a restrictive covenant is enforceable against a third party beneficiary if "the restrictive covenant expressly identified the person as a third party beneficiary of the contract and expressly stated that the restrictive covenant was intended for the benefit of such person."  The franchise agreement does not state as much.  The only reference is at section 20.14, titled "no liability to others; no other beneficiaries."  It states, in pertinent part, "[e]xcept as specifically described in this Agreement, no other party has any rights because of this Agreement."  (Doc. 48, Ex. A).  Such suggests to me that absent some express reference to Dr. Mattei, neither she nor Medi may claim rights under the agreement, such that she is subject to its restrictive covenants.  Thus, I decline to find on this Motion that Dr. Mattei may be reached as a beneficiary of the franchise agreement.

[14]Defendants argues that Mattei is operating within the carve out of the competitive restriction provision of her agreement.  (Doc. 53 at 4).  Her agreement expressly states:

> This Restrictive Covenant is not intended to prohibit the medical professional from practicing medicine in medical areas other than weight loss, or prohibit the medical professional from treating his or her patients for weight loss,

Texas law because of the lack of a buy-out clause,[15] I find from the proffered evidence that Mattei and Green knowingly and wilfully conspired and cooperated to create a new and competitive business in violation of the restrictive covenants.

The proffered evidence reveals that the creation of Revolution was a deliberate attempt to bypass the restrictive covenants by offering a purportedly expanded menu of services by Dr. Mattei to existing Medi customers and others. According to Brooks Edlund, the Senior Vice President for Western Business Development at Medi, on April 2, 2013, Green requested for Medi to provide him the email addresses and cell phone numbers for all patients at his clinics. (Doc. 50-3 at 6). Medi provided that information directly to Green. *Id.* In anticipation of the termination of the franchise agreement, Mattei used that confidential information, which included Mr. Edlund's email address, to send an email on April 26, 2013, to Medi customers advertising her new clinic, Revolution. *Id.*; *see also* (Doc. 48, Ex. X). To begin operations, Mattei and Green merely altered the facade of the existing Medi signage at the clinic. (Doc.

_____

> provided the medical practice does not actively advertise and market weight loss services to the public and does not generate more than 10% of its gross revenues from such services.

(Doc. 48, Ex. E at 2). Defendants argue that Revolution only offers weight loss services if it is a necessary part of the comprehensive healthcare and wellness regimen that Mattei offers at Revolution. Moreover, in her advertising for Revolution, she has not targeted weight loss services. Thus, Mattei is operating within this carve out provision. *See* (Doc. 53 at 4-5). Beyond the anecdotal evidence and representations of the parties, there is little proof to help evaluate this claim by Mattei.

[15]Section 15.50(b) of the Texas Business and Commercial Code requires that "[a] covenant not to compete relating to the practice of medicine is enforceable against a person licensed as a physician by the Texas Medical Board if such covenant . . . provide[s] for a buy out of the covenant by the physician at a reasonable price . . . ." TEX. BUS. & COM. CODE § 15.50(b)(2). Here, the Medical Director Agreement does not contain a buy out provision for Dr. Mattei.

48, Ex. Z-1).  As of May 1, 2013, prior to the extended termination date of the Franchise

Agreement at 5:00 p.m. that day, the sign was observed to not fully cover the Medi sign.

(Doc. 48, Ex. CC).  Indeed, the consuming public was able to see part of the sign, and also

could see "Med" on the sign in the window.  (Doc. 48, Ex. DD).  Moreover, on April 26,

2013, a phone call made by Hilary Armstrong through the main Medi number, documented a

Southlake employee answering the phone as Medi-Weightloss clinic, but then stating that

Revolution would be opening on Monday and would be providing a wellness and weightloss

program.  (Doc. 48, Ex. Y at 2).  The individual attempted to get the name and number of the

caller so that on Monday, Revolution could call her about making a new patient appointment.

*Id.* at 3. On Monday, it was business as usual with Dr. Mattei seeing former Medi customers

for their weight-loss and other health care needs.  At least at the outset, it appears that was no

change in the processes employed by Revolution to offer its services to its Medi customers.

*See* (Doc. 48, Exs. CC-DD).  Certainly, none of this could have happened without the active

and concerted efforts of Mattei and Green.  Although disputed, it further appears that weight-

loss continued as a significant focus of the new business.  According to Tennison's affidavit,

thereafter, 85% of Mattei's patients were Medi patients from either the Southlake or Las

Colinas clinic.  (Doc. 48, Ex. HH).  Moreover, Mattei's services were supported by the same

employees that had worked at Southlake or Las Colinas, and who were performing the same

duties.  By my consideration, Plaintiffs are substantially likely to succeed on the claims that

Mattei and Green actively conspired to breach the restrictive covenants to the detriment of

Medi.

2.

Apart from the Agreements, Plaintiffs are likely to prevail on the claim against Mattei for tortious interference.  To prove a claim for tortious interference with a business relationship, a plaintiff must establish: (1) the existence of a business relationship between the plaintiff and a third party; (2) defendant's knowledge of the relationship; (3) defendant's intentional and unjustified interference with the relationship; and (4) damages to the plaintiff.  *See Tamiami Trail Tours, Inc. v. Cotton,* 463 So.2d 1126, 1127 (Fla. 1985).  Here, Mattei was employed as the Medical Director for both the Las Colinas and Southlake Medi clinics and she signed an agreement with restrictive covenants where Medi was a third party beneficiary (Doc. 48, Ex. E).  As the Medical Director, she was aware of Medi's relationship with its franchisees, its processes and it customers.  On April 26, 2013, Mattei emailed the clinic's consumers by using Medi's confidential information to announce her new clinic.  (Doc. 48, Ex. X).  Thereafter, ignoring any competitive restrictions, she continued to serve Medi's former customers as her own.  Affidavits from individuals noted overhearing Revolution staff members telling callers that Revolution was the same as Medi.  *See* (Doc. 48, Exs. CC-DD).  Despite Mattei's concerns with abandonment of patients, the evidence suggests that she deliberately interfered with Medi's business relationships by the creation and operation of Revolution.  I also conclude that Plaintiff has suffered damages to its goodwill and reputation.  Thus, Plaintiff is likely to prevail on allegations that Mattei interfered with the business relationship between Medi and its customers.

24

3.

Medi also seeks to enjoin Defendants from using its confidential and propriety information, and from using the Medi-Marks on its claims for misappropriation of trade secrets, common law unfair competition as to Medi's trademarks and service marks, and false designation of origin under the Lanham Act.

While not as well developed on this Motion, and some of the alleged infringements are not demonstrated to be on-going, I find that on the proffered evidence, Medi has shown a substantial likelihood of success on its claims relating to breach of the confidential and proprietary information pursuant to the written agreements, misappropriation of trade secrets and proprietary information even in the absence of a contractual breach, and common law unfair competition and statutory trademark infringement.

Florida recognizes as legitimate business interests both trade secrets and valuable confidential business or professional information that otherwise does not qualify as trade secrets.  Under Florida law, a trade secret consists of information that (1) derives independent economic value from not being generally known to and not readily ascertainable by others who can obtain economic value from its disclosure or use; and (2) is the subject of reasonable efforts to maintain its secrecy.  *See* FLA. STAT. § 688.002(4).  In an action involving alleged trade secrets, "the plaintiff bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy."  *Am. Red Cross v. Palm Beach Blood Bank*, *Inc.,* 143 F.3d 1407, 1410 (11th Cir. 1998) (applying Florida law).

As for the claims of common law unfair competition and statutory trademark infringement, the elements of the two are the same.  *See Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1025-26 (11th Cir. 1989).  "Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition."  *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012) (quoting *Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1193 n.4 (11th Cir. 2001)).  Where the court concludes that a plaintiff "is entitled to a preliminary injunction on its trademark infringement claim, [it] need not address whether [Plaintiff] is entitled to injunctive relief on the unfair competition claim."  *Tally-Ho, Inc.*, 889 F.2d at 1026 n.14.

Accordingly, to prevail on a trademark infringement claim under § 1125(a) of the Lanham Act, Plaintiff must establish (1) that it had enforceable trademark rights in the mark or name, and (2) that Defendants made unauthorized use of it "such that consumers were likely to confuse the two."  *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647-48 (11th Cir. 2007) (quoting *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.,* 106 F.3d 355, 358 (11th Cir. 1997)).  In order to establish likelihood of confusion, a court considers seven factors,[16] although "[t]he type of mark and evidence of actual confusion

_____

[16]The Eleventh Circuit has established seven factors in assessing whether or not the "likelihood of confusion exists."

1) the type of mark (in short, whether the "relationship between the name and the service or good it describes" is such that the chosen name qualifies as generic, descriptive, suggestive, or arbitrary); (2) the similarity of the marks (based on "the overall impressions that the marks create, including the sound, appearance, and manner in which they are used"); (3) the similarity of the goods ("whether the products are the kind that the public attributes to a single

are the most weighty of considerations."  *Id.* at 650 (quoting *Hi-Tech Pharms., Inc. v. Herbal Health Prods., Inc.,* 132 F. App'x 348, 350 (11th Cir. 2005)).

As set forth more fully in its Verified Consolidated Complaint and the Franchise Agreement, Medi has shown that it possesses valuable confidential and proprietary information, trade secrets and other intellectual property warranting protection.  *See* (Doc. 48, Ex. A).  While Defendants argue that Medi's weight loss techniques are not trade secrets or confidential information, Medi has demonstrated that it takes significant efforts to maintain the secrecy of its trade secrets and confidential and proprietary information.  (Doc. 48, Exs. II-JJ).  Indeed, Medi required the Defendants to continually agree to maintain the confidentiality of the trade secrets and other confidential and proprietary information they received as a result of entering into the Franchise Agreement with Medi.  *See* (Doc. 48, Ex. A).  Medi has shown that Defendants used forms, which while formatted differently, contained extremely similar content.  (Doc. 48, Exs. FF-1, FF-2).  Moreover, Mattei asked Cherry Sheila to "use her personal computer to doctor Medi Weightloss Clinics business forms, including Medi Weightloss Clinics businesses' patient intake paperwork, a urianlysis form, the bariatric

---

source"); (4) the similarity of the parties' retail outlets, trade channels, and customers ("consider[ing] where, how, and to whom the parties' products are sold"); (5) the similarity of advertising media (examining "each party's method of advertising" to determine "whether there is likely to be significant enough overlap" in the respective target audiences such "that a possibility of confusion could result"); (6) the defendant's intent (determining whether the defendant had a "conscious intent to capitalize on [the plaintiff's] business reputation," was "intentionally blind," or otherwise manifested "improper intent"); and (7) actual confusion (that is, whether there is evidence that consumers were actually confused).

*Custom* Mfg., 508 F.3d at 648 (citing *Frehling Enters., Inc. v. Int'l Select Grp., Inc.,* 192 F.3d 1330, 1335-41 (11th Cir. 1999)).

physical form, a consent form, and a HIPAA form, to remove references to 'Medi' from a number of key forms so they could be used in operating Revolution."[17]  (Doc. 48, Ex. HH at 4).  The same equipment and supplies were used; the staff were not told to purchase any new medical supplies of equipment.  *Id.* at 2.  Moreover, it was with the use of Medi's confidential information, particularly patient contact information, that Mattei sent her email to Medi patients to inform them that she was opening her new clinic.[18]  *See* (Doc. 48, Ex. X).  After termination of the Agreement, Revolution continued to use the Medi telephone number, passing itself off as similar to the Medi clinic.  (Doc. 50-3 at 7).  Indeed, individuals that called the number, heard a recording that said, the "new phone number is 817-488-2837," which is Revolution's new phone number.  *Id.*

Furthermore, Defendants do not attempt to argue that Medi does not have enforceable trademarks and service marks, and they offer little beyond opinion on the matter of confusion. Plaintiffs argue that Defendants' continued use of the Medi Marks while operating a competitive business causes confusion.  The affidavit from Katie Altine suggests that after termination of the Agreement, as of May 3, 2013, the Medi-Weightloss Clinics business logo remained mounted on the wall in the reception room.  (Doc. 48, Ex. DD at 1).  Eric Padilla, who visited the clinic on May 1, 2013, saw the business labeled outside as Revolution, but overheard the front desk clarifying confusion when they answered the phone, stating, "[o]h no,

---

[17]In response, Dr. Mattei contends that the current patient forms that she uses are ones that she developed based on her education, experience, training and internet searches.  (Doc. 54-2 at 7).

[18]Mattei does not dispute that the email was sent to her Medi patients; instead, she argues that it was sent in accordance with her obligations under Texas law.  (Doc. 53-1 at 3).

this IS Medi, we just changed our name, but it is the same doctor." (Doc. 48, Ex. CC at 1).

Katie Altine, who visited the clinic on May 3, 2013, overheard the front desk answer the

phone as "Medi Weightloss." (Doc. 48, Ex. DD at 2).  Defendants counter, through exhibits

attached to Dr. Mattei's affidavit, that as of June 24, 2013, the clinic does not display Medi

Marks, and that the clinic has the Revolution logo and signs throughout the clinic.  *See* (Docs.

54-2, 54-3).  Dr. Mattei also states that she did not instruct her staff to tell patients that

Revolution's program was the same as Medi's.  (Doc. 54-2 at 3).  While the evidence of

consumer confusion and ongoing use of Medi marks is relatively weak, the very existence of

Revolution at Medi's former site, while offering the same or similar services, is confusing and

harmful to Medi.  I conclude that Plaintiff is substantially likely to prevail on the claims of the

infringement as well.

## B.

As a prerequisite to the entry of a preliminary injunction, Medi must also establish it

will suffer irreparable harm unless the injunction is issued.  *Siegel*, 234 F.3d at 1176

("Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of

a substantial likelihood of irreparable injury would, standing alone, make preliminary

injunctive relief improper.").  In the context of a preliminary injunction, the asserted

irreparable harm must be actual and imminent, rather than remote or speculative.  *Id.*  Florida

law provides that "[t]he violation of an enforceable restrictive covenant creates a presumption

of irreparable injury to the person seeking enforcement of a restrictive covenant."  FLA. STAT.

§ 542.335(1)(j).  However, this presumption is rebuttable.  *Proudfoot Consulting Co. v.*

*Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009) (citing *JonJuan Salon, Inc. v. Acosta*, 922 So.2d 1081, 1084 (Fla. Dist. Ct. App. 2006)).  Defendants have failed to rebut the presumption of irreparable injury to Medi as a result of the violation of the restrictive covenants.  While it appears that some of Plaintiffs' concerns may have been remedied, Plaintiffs continue to suffer irreparable injury by the ongoing operation of Revolution.  Medi has shown that if a preliminary injunction does not issue, it will have to compete with former franchisees and employees who agreed not to engage in such competition, using its former location; will lose the exclusivity and confidentiality of its proprietary and confidential information and the benefits of its agreements; will suffer dilution and confusion associated with its intellectual property as well as its products and services; and will not be able to enforce its agreements with other franchisees.  As such, the Court may presume that Medi suffers and will continue to suffer irreparable harm due to Defendants' violations of the enforceable restrictive covenants in the parties' Agreements.  Accordingly, Medi has met its burden as to the irreparable harm prerequisite.

Furthermore, as to the trademark claims, a strong showing of likelihood of confusion caused by trademark infringement may, by itself, constitute a showing of a substantial threat of irreparable harm.  *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998).  The Eleventh Circuit employs a seven-factor test for determining the likelihood of confusion between two marks.  *E.g., Custom Mfg*., 508 F.3d at 648 (citing *Frehling Enters., Inc. v. Int'l Select Grp., Inc.,* 192 F.3d 1330, 1335-41 (11th Cir. 1999)); *see supra* text accompanying note 16.

Here, as they have been developed, the factors weigh in favor of a finding that confusion by customers would be very likely.  First, as established by Hilary Armstrong, Eric Padilla and Katie Altine, before and after the termination of the franchise agreement, the phone was being answered as a Medi Weightloss clinic.  (Doc. 48, Exs. Y, CC-DD).  On their LinkedIn page, Facebook page and Yelp listing, Defendants held themselves out as associated with a Medi Weightloss clinic for a period of time.[19]  Even with an expanded menu of medical services, it appears that the weight loss services are similar and remain a significant focus of Revolution, while being offered at the same location and by the same personnel.  (Doc. 48, Exs. CC-DD).  Accordingly, Medi has adequately demonstrated it will suffer irreparable harm relating to unfair competition and the infringement allegations.

C.

Having demonstrated that it will suffer irreparable harm, Medi must also establish that the threatened harm to it outweighs the harm a preliminary injunction may cause to Defendants.  Here, the balance of harm tips in favor of Medi.  Indeed, Medi seeks to enforce valid restrictive covenants and to preserve the integrity of its intellectual property to protect its legitimate business interests.  As noted above, Medi currently suffers and will continue to suffer irreparable harm in the form of competition with former franchisees and employees who agreed not to engage in competition; loss of the exclusivity and confidentiality of its proprietary and confidential information; and likely confusion associated with its intellectual

---

[19]Defendants assert that they no longer do this.  However, at least as to the period where they did hold themselves out as being associated with Medi Weightloss, an injury was committed.

property as well as its products and services.  Indeed, Florida law provides that courts must not consider any individualized economic or other hardship that might be caused to the person against whom enforcement of valid restrictive covenants is sought.  FLA. STAT. § 542.335(1)(g).  Accordingly, the Court need not consider whether enforcement of Medi's valid restrictive covenants will require Defendants to cease operating their competitive business or otherwise cause them economic hardship.[20]  While Defendants argue that Dr. Mattei's patients would be compromised; would lose the right to choose their doctor; and would lose "what may be the only physician in that geographic region" with Mattei's experience, Dr. Mattei could relocate to a non-offending location and these patients would not necessarily be so affected.  In sum, Defendants do not demonstrate significant harm which outweighs the harm to Plaintiffs.  That is, the balance of harm weighs in favor of granting a preliminary injunction to Medi.

### D.

Finally, Medi must show the preliminary injunction would not disserve or be adverse to the public interest.  Where an otherwise enforceable restrictive covenant exists, Florida law requires a court refusing enforcement of such provision on the basis that it violates public policy to specifically articulate the public policy violated.  FLA. STAT. § 542.335(1)(I).  Further, the court must find that the specified public policy requirements substantially

---

[20]Defendants argue that the issuance of an injunction would put Dr. Mattei and Revolution's employees out of work; her reputation would be damaged; she would not be able to fulfill the obligations to her landlord; and it would affect her son's schooling.  (Doc. 53 at 17).

32

outweigh the need to protect the legitimate business interests established by the person seeking enforcement. *Id*.

In this instance, entry of a preliminary injunction would serve the public interest by enforcing valid contractual provisions freely entered into by the parties; by promoting stability and certainty in business relationships; by enforcing non-compete covenants permissible under Florida law; by preventing confusion as to a trademark owner's rights to control the use of its marks; and by protecting confidential, proprietary and trade secret information of businesses. Defendants reiterate their previous arguments of individualized harm to Defendants and to their patients. However, as discussed above and as Medi has provided substantial evidence for a preliminary injunction, I find Defendants' arguments to the contrary unavailing. Rather, Medi has demonstrated that entry of a preliminary injunction would in fact serve rather than be adverse to the public interest and would not violate any public policy. Accordingly, the public interest considerations support Medi's request for entry of a preliminary injunction.

E.

Though Medi has met its burden as to the prerequisites for entry of a preliminary injunction, the Court may issue a preliminary injunction only if Medi provides security in an amount the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. Fed. R. Civ. P. 65(c).[21] The burden of

---

[21]*See also* FLA. STAT. § 542.335(1)(j) ("No temporary injunction shall be entered unless the person seeking enforcement of a restrictive covenant gives a proper bond, and the court shall not enforce any contractual provision waiving the requirement of an injunction bond or limiting the amount of such bond.").

establishing a rational basis for the amount of a proposed bond rests with the party seeking security. *Cont'l Grp., Inc. v. KW Prop. Mgmt., LLC*, No. 09-60202-CV, 2009 WL 3644475, at *6 (S.D. Fla. Oct. 30, 2009) ("The 'burden is on the party seeking security to establish a rational basis for the amount of a proposed bond.'"). The determination of the amount of the injunction bond, however, lies within the sound discretion of the Court. *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1127 (11th Cir. 1997). Medi requests that the Court set the bond at $10,000, while Defendants argue that a $2.5 million bond would be a sufficient amount. By my consideration, an amount at the lower end is more appropriate.

## V.

A preliminary injunction is an extraordinary remedy to be used only when a party carries its burden as to the four prerequisites. *Four Seasons,* 320 F.3d at 1210. In this instance, Medi has carried its burden as to all four prerequisites as to all Defendants. Accordingly, it is hereby RECOMMENDED that Defendants and all acting in concert with them be enjoined:

1) from violating the competitive and confidentiality provisions of the written agreements, including from engaging in any Competitive Business at its current location and at any other location within twenty-five (25) miles of any Medi clinic;

2) from providing to anyone or otherwise using in any manner, or disclosing to anyone the Medi-System or Medi-Program, Medi-Products, any forms and materials relative thereto, including the Medi Weightloss Clinics patient handouts, intake paperwork, cholesterol sheet,

bariatric physical form, consent form, and HIAA form, as well as any forms developed from such materials;

3) from providing to anyone, disclosing, or otherwise using in any manner the Medi Confidential Information;

4) from using or displaying the Medi Marks, logos, and advertising materials in any medium, in a manner that implies any association whatsoever between them and Medi and/or Medi IP;

5) to return to Medi any materials and copies constituting or relating to the Products and Services, Medi-Program, Medi-System, Medi Confidential Information, Advantage System materials, and Medi-Marks or, to confirm by sworn affidavit that all such material has been returned or destroyed;

6) to notify its customers of the entry of this injunction and the location of Medi clinics in the region to which they may transfer services, should they wish;

7) to be required to post bond in the amount of $10,000 or less.

Respectfully submitted this
4th day of September 2013.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6.

Copies furnished to:
United States District Judge
Counsel of Record